# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 10, 2011

No. 11-30110

Lyle W. Cayce
Clerk

ANN DESHOTELS; KIMBERLY ANN DESHOTELS; JAMIE JOURDAN DESHOTELS PUCHEU; MATTHEW RISHER DESHOTELS,

Plaintiffs-Appellants

v.

MIKE MARSHALL; TRAVIS MILLER; ANTHONY MANCUSO; JEFF PITTMAN; JEFF MORGAN; CITY OF LAKE CHARLES; ST. PAUL FIRE & MARINE INSURANCE COMPANY,

Defendants-Appellees

---

Appeal from the United States District Court
for the Western District of Louisiana

---

Before JOLLY, DeMOSS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Seldon Deshotels died shortly after an altercation with law enforcement officers from the Lake Charles Police Department and the Calcasieu Parish Sheriff's Office. His surviving wife and children, Plaintiffs-Appellants, filed suit against the officers and their employers, among others, asserting claims under 42 U.S.C. § 1983 and state law. The district court granted summary judgment

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-30110

dismissing various claims against appellees Mike Marshall, Travis Miller, Jeff Pittman, Jeff Morgan, and Anthony Mancuso. For the following reasons, we AFFIRM.

## BACKGROUND

The incident giving rise to this case occurred on November 1, 2007, in Lake Charles, Louisiana. At approximately 9:20 p.m., Cherie Norsworthy looked out her back door and saw Seldon Deshotels in her garage. Deshotels, a clinical and anatomical pathologist, had recently moved to Lake Charles for employment purposes and was living in the nearby Nelson Pointe apartment complex. Ms. Norsworthy did not recognize Deshotels, but assumed he was there to see her husband.[1] When she opened the door and asked if he was "looking for Greg," Deshotels "kind of panicked" and quickly exited the garage. Alarmed by Deshotels's reaction, Ms. Norsworthy went back into the house and yelled for her husband.

When Ms. Norsworthy told her husband what happened, he instructed her to call the police and then immediately left the house to look for Deshotels. Ms. Norsworthy contacted the Calcasieu Parish Sheriff's Office (CPSO). Mr. Norsworthy searched the neighborhood on his four-wheeler and eventually located Deshotels running toward the Nelson Pointe apartment complex. Norsworthy, a trained martial artist, caught up with Deshotels near the gate to the apartment complex, jumped on his back, and applied a choke hold that rendered Deshotels temporarily unconscious. Both men fell to the ground and Norsworthy released the choke hold. Deshotels regained consciousness shortly thereafter.

At about the same time, Jessica Cobb and two friends were driving into the apartment complex parking lot. Cobb testified that when they approached

---

[1] The Norsworthys did not know, and had never met, Deshotels.

No. 11-30110

the gate, she saw Deshotels laying on his stomach and Norsworthy sitting on his back. Norsworthy yelled to Cobb that Deshotels had broken into his house and asked her to call the police. Cobb called 911 and was connected to the Lake Charles Police Department (LCPD). She told the 911 operator that a homeowner was restraining a man who broke into his house and that they were near the gate to the Nelson Pointe apartment complex.

Both CPSO and LCPD dispatched officers to respond to the incident. LCPD officer Jeff Pittman was the first law enforcement officer at the scene. When he arrived, Deshotels was sitting on the ground and Norsworthy was standing nearby. Norsworthy identified himself as the complainant and Deshotels as the burglary suspect. As Pittman approached the two men, Deshotels got up and began running toward Nelson Road. Pittman chased and quickly caught Deshotels, bringing him to the ground face down. Pittman straddled Deshotels's lower back and pulled on his left arm in an attempt to apply handcuffs. Deshotels resisted, pulling his arms down and underneath his chest. As Pittman struggled with Deshotels, CPSO deputies Mike Marshall and Travis Miller and LCPD officers Jeff Morgan and Kevin O'Rourke arrived and began assisting. Marshall attempted to gain control of Deshotels's right arm and Miller placed his knee on Deshotels's right shoulder. Deshotels was kicking his legs, so officer Morgan crossed one leg over the other and pushed them down towards Deshotels's back. Officer O'Rourke warned Deshotels to stop resisting or he would be tased. When Deshotels failed to surrender his hands, O'Rourke conducted a five second "drive-stun" tase to Deshotels's right shoulder.[2] Despite being tased, Deshotels continued to pull his arms under his chest. O'Rourke moved to Deshotels's left side and conducted another drive-stun tase to

---

[2] With a drive-stun tase, an officer shocks a suspect by applying the Taser directly to the suspect's body.

No. 11-30110

Deshotels's lower back. After the second tasing, the officers secured Deshotels's arms and applied handcuffs.[3]

Once the handcuffs were on, Pittman and Marshall attempted to lift Deshotels off the ground. They noticed that Deshotels's body was limp and that he was unable to support his own weight. At about the same time, LCPD officers John Thacker, Robert McCauley, and Larry Moss arrived at the scene. They observed Deshotels being dragged as "dead weight" in the direction of a police car. They noticed that Deshotels's face looked blue and that he did not appear to be breathing. Thacker instructed Pittman to remove Deshotels's handcuffs and lay him on the ground. The officers removed Deshotels's handcuffs, laid him on his back, and at some point, called an ambulance.

The parties dispute what, if anything, the officers did to assist Deshotels before the ambulance arrived. McCauley testified that Deshotels's tongue appeared to be blocking his airway. He stated that Moss held Deshotels's head while he used a pen to move Deshotels's tongue in an attempt to clear the blockage. Moss testified that he assisted McCauley until a paramedic arrived and was standing next to Deshotels.

Appellants point to the deposition testimony of Walter Siefford, an EMT/paramedic who responded to the incident. Siefford testified that when he arrived at the scene, Deshotels was lying on his back and a single officer, presumably McCauley, was attempting to pry his mouth open with a pen.[4] Siefford stated that the officer repeatedly asked him to help Deshotels. Siefford further testified that Deshotels's mouth was full of vomit and that there was

---

[3] It is not clear when Deshotels's left hand was cuffed and under control. Marshall testified that Deshotels's left hand was cuffed and in Pittman's control before Deshotels was tased. O'Rourke testified that Pittman cuffed Deshotels's left hand between the first and second tasing. Pittman testified that neither hand was cuffed until after the second tasing.

[4] According to Siefford, seven to eight officers were congregated near the parking lot gate.

vomit on his face and in the area around his head. McCauley, Moss, and Thacker all testified that they did not see Deshotels vomit and did not see vomit on or around Deshotels.

Deshotels was eventually transported to Women's and Children's Hospital where he was later pronounced dead. He was fifty-six years old. According to an autopsy conducted by the Parish Coroner, Dr. Terry Welke, Deshotels was asthmatic and had a blood alcohol level of .12. The reported cause of death was excited delirium. Appellants commissioned a second autopsy, which was performed by Dr. Collie Trant, a board certified forensic pathologist. Dr. Trant concluded that the cause of death was asphyxia caused by a misapplied choke hold, compression of the chest and abdomen during the struggle with the officers, and airway obstruction by gastric contents.

Appellants filed suit on September 18, 2008, naming as defendants, among others, Marshall, Miller, Pittman, Morgan, and O'Rourke, in their individual capacities, and Calcasieu Parish Sheriff Anthony Mancuso in his individual and official capacities. Appellants brought claims under § 1983 and state law for excessive force and for failing to render appropriate medical assistance. Appellants also brought § 1983 bystander liability claims, asserting that Marshall, Miller, Pittman, and Morgan are liable for failing to prevent O'Rourke from tasing Deshotels.

In opinions filed October 27, 2010, and January 4, 2011, the district court granted summary judgment dismissing Appellants' excessive force and bystander liability claims against Marshall, Miller, Pittman, and Morgan. The district court also granted summary judgment dismissing Appellants' official and individual capacity excessive force claims against Calcasieu Parish Sheriff Anthony Mancuso. The court denied summary judgment on Appellants' excessive force claims against O'Rourke. The court also denied summary judgment on Appellants' claims against Marshall, Miller, Pittman, and Morgan for failing to

No. 11-30110

render appropriate medical assistance. Those claims are currently pending before the district court. The judgments accompanying the October 27 and January 4 opinions were certified as final and appealable under Rule 54(b) of the Federal Rules of Civil Procedure.

## DISCUSSION

This court reviews the grant of summary judgment de novo, applying the same standard used by the district court. *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 233 (5th Cir. 2009). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.* (quoting *Hamilton*, 232 F.3d at 477). In determining whether a fact issue exists, the court views "the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

*Section 1983 Claims Against Marshall, Miller, Pittman, and Morgan*

1. Excessive Force

The district court concluded that Marshall's, Miller's, Pittman's, and Morgan's actions to subdue and handcuff Deshotels were objectively reasonable and that the officers are entitled to qualified immunity from Appellants' § 1983 excessive force claims. Appellants argue that they have raised a fact issue as to whether the officers' actions were reasonable and that the district court therefore erred.

6

No. 11-30110

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, the court conducts the two-part analysis set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). The court decides "(1) whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) (quoting *Saucier*, 533 U.S. at 202). If the answer to either of the two above questions is "no," qualified immunity applies and the government official is immune from suit. The plaintiff bears the burden of overcoming the qualified immunity defense. *Bennett v. City of Grand Prairie, Tex.*, 883 F.2d 400, 408 (5th Cir. 1989). After the Supreme Court's decision in *Pearson*, 555 U.S. 223, courts have discretion as to which of the two qualified immunity prongs to address first.

Turning to the first prong of the qualified immunity analysis, this court must determine whether the facts, taken in the light most favorable to Appellants, show that the officers violated a constitutional right. "[A]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 487 (5th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (alteration in original). To prevail in an excessive force claim, "a plaintiff must show that he was seized and that

he 'suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'" *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). Determining whether an officer's use of force was objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts must be mindful that police officers are often required to make split-second judgments "in circumstances that are tense, uncertain, and rapidly evolving" and must evaluate an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396–97.

To support a fact issue, Appellants point to Marshall's deposition testimony stating that he was not concerned for his or the other officers' safety during the struggle with Deshotels and that he believed they could have handcuffed Deshotels without the use of a Taser. Appellants also point to Miller's testimony that he agreed with O'Rourke's use of a Taser and that he would have used his Taser had O'Rourke not done so first. Appellants further note that Deshotels did not attempt to strike or kick the officers and that the LCPD use of force report characterized Deshotels's behavior as "empty hand defensive resistance."

Appellants' evidence tends to focus on whether O'Rourke's use of a Taser constituted excessive force, an issue not before the court. The relevant inquiry is whether Marshall's, Miller's, Pittman's, and Morgan's individual actions to subdue and handcuff Deshotels were reasonable under the circumstances. *See Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007) (holding that each officer's individual actions should be considered in determining whether

qualified immunity applies). The facts show that the officers were responding to a burglary in progress, "a crime normally and reasonably expected to involve a weapon."[5] *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007). When Pittman approached the scene, Deshotels immediately fled, and when caught, actively resisted Pittman's attempts to apply handcuffs. Marshall, Miller, and Morgan arrived to see Pittman struggling with a large, unruly suspect. (At the time of the autopsy, Deshotels was 5'10" tall and 240 lbs.) The officers repeatedly instructed Deshotels to show them his hands and to stop resisting. Despite the commands, Deshotels continued to resist the officers by pulling his arms under his chest. Though the officers had not seen a weapon on Deshotels, they had also not confirmed that he was unarmed. To secure Deshotels, Pittman straddled his back and pulled on his left arm. Miller kneeled on Deshotels's right shoulder while Marshall seized Deshotels's right forearm. Morgan folded one of Deshotels's legs over the other to stop him from kicking. In light of the above described circumstances, the officers' actions were objectively reasonable and they are entitled to qualified immunity from Appellants' § 1983 excessive force claims.

2. Bystander Liability

Appellants argue that Marshall, Miller, Pittman, and Morgan are liable for failing to prevent O'Rourke's alleged use of excessive force when he tased Deshotels.[6] In support of these claims, Appellants rely on this court's holding in *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995), that "an officer who is present

---

[5] CPSO deputies Marshall and Miller were initially dispatched to respond to a trespass at the Norsworthy's house. As they were driving to the Norsworthy's, Pittman passed them in his patrol car with his lights and siren on. The dispatch informed the deputies that Pittman was responding to a burglary in progress at the Nelson Pointe complex. They assumed that their call and Pittman's were related and decided to follow him to the apartment complex.

[6] As mentioned above, Appellants' § 1983 excessive force claim against O'Rourke is currently pending at the district court. There has been no determination whether O'Rourke's use of a Taser constituted excessive force and we offer no opinion on that question.

No. 11-30110

at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." The court determined that liability under § 1983 can attach when the bystander officer "had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Id.* Appellants maintain that Marshall, Miller, Pittman, and Morgan had an opportunity to realize that O'Rourke was going to tase Deshotels and to intervene and stop him.[7]

As discussed above, to overcome the officers' defense of qualified immunity, Appellants must show that the officers "violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009). Exercising the discretion provided in *Pearson*, 555 U.S. 223, we first consider whether the officers' conduct violated clearly established law. If the answer is "no," the officers are entitled to qualified immunity and the court need not decide whether Appellants' facts make out the violation of a constitutional right.

For a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202. "As we have held, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." *Pasco*, 566 F.3d at 579–80 (internal quotations omitted); *see also Saucier*, 533

---

[7] In support, Appellants point to testimony that Deshotels was verbally warned that he would be tased unless he stopped resisting. O'Rourke testified that before he tased Deshotels he told him "stop resisting or I'm going to deploy the Taser on you." Marshall testified that O'Rourke said "Taser, Taser, Taser," before he tased Deshotels. Brady Hendrix, an eyewitness, testified that he heard an officer tell Deshotels "if you keep moving, you will get tased." Appellants argue that if these warnings were sufficient for Deshotels to cease struggling and avoid being tased, they were also sufficient to alert the officers that O'Rourke planned to use his Taser and to do something to stop him.

No. 11-30110

U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). "[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotations omitted).

Thus, the inquiry is whether, under the law in effect at the time of the arrest, the officers could have reasonably believed that they were not required to intervene and prevent O'Rourke's alleged use of excessive force. The answer to that question is clearly "yes." The facts in *Hale* are significantly different from the facts in this case. In *Hale*, the plaintiff produced evidence that he was beaten by a police officer while the bystander officer stood by and laughed, making no effort to intervene. *Hale*, 45 F.3d at 919. Nothing in *Hale* provided police officers "fair notice" that officers actively engaged in restraining a large, potentially dangerous suspect are required to intervene and prevent another officer's use of excessive force. *See Manis*, 585 F.3d at 845–46 ("If the law at the time of a constitutional violation does not give the officer 'fair notice' that his conduct is unlawful, the officer is immune from suit."). Nor do Appellants provide any other authority, and we could not find any, supporting that proposition. Accordingly, the officers' actions were objectively reasonable in light of clearly established law and they are entitled to qualified immunity.

*State Law Claims Against Marshall, Miller, Pittman, and Morgan*

Appellants argue that the district court erred in dismissing their state law excessive force claims against Marshall, Miller, Pittman, and Morgan. In Louisiana, excessive force claims are analyzed under a reasonableness standard similar to that used to evaluate § 1983 excessive force claims. *Kyle v. City of New Orleans*, 353 So. 2d 969, 972–73 (La. 1977). "Whether the force used is reasonable depends upon the totality of the facts and circumstances in each

case." *Id.* at 973. Factors to be considered include "the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment." *Id.* Given the similarity between these factors and those used to evaluate § 1983 excessive force claims, we conclude that the officers' use of force was reasonable under Louisiana law for the same reasons the use of force was reasonable under the Fourth Amendment. *See Deville v. Marcantel*, 567 F.3d 156, 173 (5th Cir. 2009) ("These considerations are sufficiently similar to the *Graham* factors that our decision on this claim mirrors our decision of plaintiffs' § 1983 excessive force claim . . . ."); *see also Winston v. City of Shreveport*, 390 F. App'x 379, 385–86 (5th Cir. 2010). We affirm the district court's dismissal of Appellants' state law excessive force claims.

Appellants also argue that the district court erred in dismissing claims that the officers were negligent under Louisiana law because they "had notice of O'Rourke's intentions with regard to the use of his Taser and . . . failed to take any action whatsoever to prohibit O'Rourke's excessive use of force." Appellants' brief, however, provides no authority discussing bystander liability claims under Louisiana law or whether Louisiana law enforcement officers have a duty to prevent another officer's use of excessive force. Accordingly, that argument is waived. *See Kohler v. Englade*, 470 F.3d 1104, 1114 (5th Cir. 2006) (holding appellant's claim waived for inadequate briefing because it was not supported with any legal authority); *Salazar-Regino v. Trominski*, 415 F.3d 436, 452 (5th Cir. 2005) (holding that a claim supported by only one citation was waived for inadequate briefing), *vacated on other grounds sub nom. Salazar-Regino v. Moore*, 549 U.S. 1093 (2006); *L & A Contracting Co. v. S. Concrete Servs. Inc.*, 17 F.3d 106, 113 (5th Cir. 1994) ("Southern cites no authority in its one-page

argument on the attorney fee question, however, and we consider the challenge abandoned for being inadequately briefed.").

*Vicarious Liability Excessive Force Claim Against Sheriff Mancuso*

In Louisiana, sheriffs are vicariously liable in their official capacity for the torts of their deputies committed in the course and scope of employment. *Jenkins v. Jefferson Parish Sheriff's Office*, 402 So. 2d 669, 669 (La. 1981); *Riley v. Evangeline Parish Sheriff's Office*, 94-C-0202, p. 1 (La. 4/4/94); 637 So. 2d 395, 395. Appellants argue that the state law excessive force claims against deputies Marshall and Miller were erroneously dismissed and therefore it follows that the vicarious liability excessive force claim against Calcasieu Parish Sheriff Anthony Mancuso was also erroneously dismissed. As discussed above, the state law excessive force claims against deputies Marshall and Miller were correctly dismissed by the district court. Therefore, there is no basis for a vicarious liability excessive force claim against Sheriff Mancuso. The district court's ruling on this issue is affirmed.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judge dismissing Appellants' § 1983 and state law excessive force and bystander liability claims against officers Marshall, Miller, Pittman, and Morgan. We also affirm the dismissal of the state law excessive force claims against Sheriff Mancuso.